498 S.E.2d 408

Alethia SIMMONS, in her fiduciary capacity as Personal Representative of the Estate of P.J. McBride, Deceased, Appellant,

v.

TUOMEY REGIONAL MEDICAL CENTER, Einar Anderson, M.D., and Sandy T. Cooper, M.D., Defendants,

Of which Tuomey Regional Medical Center is, Respondent.

No. 2788.

Court of Appeals of South Carolina.

Heard Nov. 4, 1997.
Decided Feb. 2, 1998.
Rehearing Denied March 19, 1998.

J. Edward Bell, III, and Eugene C. Fulton, Jr., both of Bell & Moore, Sumter, for appellant.

Harold W. Jacobs, Jennifer J. Aldrich and Elizabeth Ann Felder, all of Nexsen, Pruet, Jacobs & Pollard, Columbia, for respondents.

HOWELL, Chief Judge:

Alethia Simmons, as personal representative for her father, P.J. McBride, filed a medical malpractice action against Tuomey Regional Medical Center and the doctors who treated McBride. Simmons alleged that McBride died as a result of the negligent diagnosis and treatment he received at the Tuomey emergency room. The trial court granted Tuomey's motion for summary judgment. We reverse and remand.

## I.

On January 24, 1994, McBride was involved in an accident while driving his moped. Upon learning of the accident, Simmons rushed to the scene, where she found emergency service personnel attending to an injury to the back of her father's head. McBride was taken to Tuomey where Simmons signed an admission form for her father. The admission form contained the following provision:

THE PHYSICIANS PRACTICING IN THIS EMERGEN-CY ROOM ARE NOT EMPLOYEES OF TUOMEY RE-GIONAL MEDICAL CENTER. THEY ARE INDEPEN-DENT PHYSICIANS, AS ARE ALL PHYSICIANS PRACTICING IN THIS HOSPITAL.

While in Tuomey's emergency room, Dr. Cooper and Dr. Anderson examined McBride. Despite McBride's confused state, the doctors decided to treat his contusions and release him from the hospital with the instruction to refrain from drinking alcohol. The doctors, apparently attributing McBride's confusion to intoxication, did not treat his head injury.

The next day, McBride returned to Tuomey where his head injury was diagnosed as a subdural hematoma. Ultimately, McBride was transported to Richland Memorial Hospital. Approximately six weeks later, McBride died of complications from the subdural hematoma.

When Simmons brought this suit, Tuomey moved for summary judgment by alleging it was not liable because the doctors were independent contractors. Tuomey relied on its June 1987 contract with Coastal Physicians Services, which set forth the procedures by which Coastal would provide emergency room physicians to Tuomey. The carefully-worded contract referred numerous times to the physicians as "independent contractors" and stated that Tuomey agreed not to exercise "any control over the means, manner, or methods by which any Physician supplied by [Coastal] carries out his duties." The trial court accorded great weight to the Coastal–Tuomey contract when it granted Tuomey's motion for summary judgment. Simmons appeals, arguing the trial court

erred in granting summary judgment on the issues of actual agency, apparent agency, and nondelegable duty.[1]

## II.

Traditionally, employers have avoided vicarious liability for the torts of their employees, which agency law imposes through the doctrine of respondeat superior, by acting through independent contractors. Restatement (Second) of Agency § 250 (1958). However, "[a] person who delegates to an independent contractor an absolute duty owed to another person remains liable for the negligence of the independent contractor just as if the independent contractor were an employee." *Durkin v. Hansen*, 313 S.C. 343, 347, 437 S.E.2d 550, 552 (Ct.App.1993) (citing 57 C.J.S. *Master and Servant*, § 591, at 365 (1948)). We conclude that a hospital's duty to its emergency room patients to provide competent medical care has evolved into an absolute duty that is incapable of being delegated. Consideration of the effect of public policy in the medical care arena leads us to this conclusion.

Originally, most hospitals were eleemosynary or charitable organizations. Because of the public service function of hospitals, the South Carolina Supreme Court first noted in *Lindler v. Columbia Hospital*, 98 S.C. 25, 81 S.E. 512 (1914), "The true ground upon which to rest the exemption from liability is that it would be against public policy to hold a charitable institution [in this case a hospital] responsible for the negligence of its servants, selected with due care." *Id.* at 28, 81 S.E. at 513. Justice Fraser, however, dissented, arguing, "It is a principle of law as well as morals, that men must be just before they are generous. There is no higher or more just principle than that a trust fund shall remedy the evil itself has done, before it attempts to remedy the evils done by others." *Id.* at 35, 81 S.E. at 515.

As the function of hospitals changed, South Carolina joined other states in re-examining the prudence of permitting institutions to evade legal liability. *See* Martin C. McWilliams, Jr., *Charitable Immunity Statutory Remnants in South Carolina*,

---

1. Although Simmons also argues Tuomey was liable under actual and apparent agency theories, our finding of liability based on the existence of a nondelegable duty renders both of these issues moot.

S.C. Lawyer, Sept.-Oct.1996, at 28. In the seminal case of *Brown v. Anderson County Hospital Association*, 268 S.C. 479, 234 S.E.2d 873 (1977), a widow and nine children brought suit for the death of their husband and father. Tragically, the deceased could not escape a fire in his hospital room because he was strapped to his bed. *Id.* at 482, 234 S.E.2d at 874. The *Brown* court defined the issue as "whether the defendant, a corporation not for profit, which has as its purpose the maintenance and operation of a hospital, and whose funds are derived from private donations, public agencies and paying patients, is immune from liability for injuries caused by the negligence and recklessness of one or more of its employees or servants." *Id.* The majority relied on Justice Fraser's dissent in *Lindler* to modify the impact of the charitable immunity doctrine on hospitals. *Id.* at 485, 234 S.E.2d at 875. The new rule held hospitals liable provided the plaintiff could prove "the injuries occurred because of the hospital's heedlessness and reckless disregard of the plaintiff's rights." *Id.* at 487, 234 S.E.2d at 876.

The holding in *Brown* remained in effect until 1981, when the supreme court rendered its decision in *Fitzer v. YMCA*, 277 S.C. 1, 282 S.E.2d 230 (1981). Justice Ness, whose dissent in *Brown* argued for total abolition of charitable immunity, 268 S.C. at 488, 234 S.E.2d at 877, succinctly stated for the majority, "The doctrine of charitable immunity has no place in today's society." *Fitzer*, 277 S.C. at 4, 282 S.E.2d at 231. The philosophical underpinnings of Justice Ness's opinion were that the public policies which once supported the doctrine of charitable immunity had changed over the course of time. *Id.* at 3, 282 S.E.2d at 231. Ness wrote, "Public policy is a dynamic not static concept, and what was valid in the past is not necessarily a valid policy today. Moreover, when the reason for a declared public policy no longer exists, we should not hesitate to abolish it and the rules which are supported by the policy." *Id.*

## III.

As public policy has continually changed tort exposure for hospitals through the years, we believe that public policy now mandates that hospitals have a nondelegable duty.

to provide competent emergency room services.[2] A nondelegable duty is essentially an exception to the general rule that principals are not liable for the torts of independent contractors. According to Dean Prosser:

A different approach, manifested in several of the exceptions to the general rule of nonliability [for independent contractors], has been to hold that the employer's enterprise, and his relation to the plaintiff, are such as to impose upon him a duty which cannot be delegated to the contractor.... [T]he cases of "nondelegable duty" ... hold the employer liable for the negligence of the contractor, although he has himself done everything that could reasonably be required of him.

.    .    .    .    .

It is difficult to suggest any criterion by which the nondelegable character of such duties may be determined, other than the conclusion of the courts that the responsibility is so important to the community that the employer should not be permitted to transfer it to another.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 71, at 511 (5th ed.1984). Following Prosser's rationale, we believe that the operation of emergency rooms is such an important activity to the community that hospitals should be liable for the negligence of emergency room care givers.

Few things are more comforting in today's society than knowing that immediate medical care is available around-the-clock at any hospital. As the Texas Court of Appeals astutely observed:

Emergency rooms are aptly named and vital.to public safety. There exists no other place to find immediate medical care. The dynamics that drive paying patients to a hospital's emergency rooms are known well. Either a sudden injury occurs, a child breaks his arm or an individual suffers a heart attack, or an existing medical condition

---

**2.** Although nondelegable duty was not expressly mentioned in Simmons's complaint, the issue was tried below without objection and incorporated in the trial court's order. In addition, Tuomey does not raise any objection to us considering the issue in its final brief on appeal. We, therefore, hold that the issue of nondelegable duty was at a minimum tried by consent according to Rule 15, SCRCP.

worsens, a diabetic lapses into a coma, demanding immediate medical attention at the nearest emergency room. The catch phrase in legal nomenclature, "time is of the essence," takes on real meaning. Generally, one cannot choose to pass by the nearest emergency room, and ·after arrival, it would be improvident to depart in hope of finding one that provides services through employees rather than independent contractors. The patient is there and must rely on the services available and agree to pay the premium charged for those services.

*Sampson v. Baptist Mem'l Hosp. Sys.*, 940 S.W.2d 128, 136 (Tex.Ct.App.1996), *writ granted*, (Sept. 4, 1997).

Indeed, the public not only relies on the medical care rendered by emergency rooms but also considers the hospital as a single-entity providing all of its medical services. A set of commentators observed,

[T]he hospital itself has come to be perceived as the provider of medical services. According to this view, patients come to the hospital to be cured, and the doctors who practice there are the hospital's instrumentalities, regardless of the nature of the private arrangements between the hospital and the physician. Whether or not this perception is accurate seemingly matters little when weighed against the momentum of changing public perception and attendant public policy.

Martin C. McWilliams, Jr. & Hamilton E. Russell, III, *Hospital Liability for Torts of Independent Contractor Physicians*, 47 S.C. L.Rev. 431, 473 (1996).

In reality, public perception of the unity of hospitals and their emergency rooms is very accurate. Outside of a narrow exception,[3] state hospital accreditation regulations require all hospitals to maintain a perpetually open emergency room. 24A S.C.Code Ann. Regs. 61–16 § 613 (1992). Section 613.1 of the South Carolina Department of Health and Environmental Control's regulation entitled Minimum Standards for Licensing Hospitals and Institutional General Infirmaries states:

---

**3.** A hospital is exempt from operating an emergency room when all the hospitals in a subdivision plan to designate a specific hospital as the provider of emergency medical services. 24A S.C.Code Ann. Regs. 61–16 § 613.6 (1992).

Each hospital shall provide emergency services which include life-saving procedures when life is in jeopardy....

A. Equipment and services shall be provided to render emergency resuscitative and life-support procedures pending transfer of the critically ill or injured to other hospitals. A minimum capacity shall be established and equipment provided to perform procedures such as hemostasis, therapy of traumatic shock, maintenance of airway and cardiopulmonary resuscitation.

B. Basic services, such as x-ray and routine laboratory services, shall be maintained and personnel available for call.

C. A licensed physician shall be available and on call at all times. A registered nurse and ancillary personnel trained in emergency procedures shall be on duty within the hospital who are available 24 hours a day subject to call to assist in providing emergency services.

*Id.; cf. Durkin,* 313 S.C. at 349, 437 S.E.2d at 553 (holding that specific duties imposed by the South Carolina Residential Landlord and Tenant Act and a rental agreement created a nondelegable duty for landlords).

The change in public reliance and public perceptions, as well as the regulations imposed on hospitals, has created an absolute duty for hospitals to provide competent medical care in their emergency rooms. Briefly stated, "[T]he hospital has lost its perch as an institution functioning in the public interest and therefore deserving of support in the form of insulation from liability." McWilliams & Russell, *supra,* at 473. Hospitals have contributed to the shift in public perception through commercial advertisements. By actively soliciting business, hospitals have effectively removed themselves from the sterile world of altruistic agencies. The Alaska Supreme Court, the first American court to recognize a nondelegable duty in the hospital context, wrote, "Not only is [finding a nondelegable duty] consonant with the public perception of the hospital as a multifaceted health care facility responsible for the quality of medical care and treatment rendered, it also treats tort liability in the medical arena in a manner that is consistent with the commercialization of American medicine." *Jackson v. Power,* 743 P.2d 1376, 1385 (Alaska 1987); *see also*

Kenneth S. Abraham & Paul C. Weiler, *Enterprise Medical Liability and the Evolution of the American Health Care System,* 108 Harv. L.Rev. 381 (1994).

Tuomey responds to Simmons's nondelegable duty argument with a curt one-sentence statement that *Strickland v. Madden,* 323 S.C. 63, 448 S.E.2d 581 (Ct.App.1994), does not impose the doctrine of corporate negligence on hospitals. Tuomey misconstrues Simmons's argument and misstates the rule in *Strickland.*

First, *Strickland* deals with corporate negligence in the context of a hospital's duty to monitor the competency of its staff physicians. *Id.* at 71, 448 S.E.2d at 586. Corporate negligence, which literally means holding a corporation liable for its negligent acts, is a form of direct liability. *See* McWilliams & Russell, *supra,* at 468. On the other hand, Simmons's argument and our holding deal with the traditional use of the term nondelegable duty. The difference between direct liability and a nondelegable duty is subtle but important.

> The real effect of finding a duty to be nondelegable is to render not the duty, but the liability, not delegable; the person subject to a nondelegable duty is certainly free to delegate the duty, but will be liable to third parties for any negligence of the delegatee, regardless of any fault on the part of the delegator.

.    .    .    .    .

> Corporate negligence is sometimes described in terms of nondelegable duties. Unfortunately, insufficient discipline is exercised by courts and commentators in the use of the term. The term nondelegable duty has traditionally been used to describe a form of vicarious liability on the part of the delegating party regardless of any fault on its part. In recent hospital cases, however, the term is used much more loosely to apply to cases in which hospitals are held liable only when they can be shown to have been negligent, and when their negligence can be shown to have had a causal relationship to the plaintiff's injury.

*Id.* at 452, 468. The plaintiff in *Strickland* was attempting to prove the hospital was negligent by not adequately monitoring the staff privileges of its doctors. In this case, however, the hospital does not actually have to be negligent of anything

because the nondelegable duty makes the hospital vicariously liable for the negligence of emergency room doctors, irrespective of any fault by the hospital.

Second, *Strickland* is not dispositive of the corporate negligence issue in South Carolina. The most definitive statement *Strickland* makes about corporate negligence is, "Assuming South Carolina would likewise recognize the doctrine of corporate negligence, its application would nonetheless require a standard of care to be established, for example, pursuant to national hospital accreditation requirements or the hospital's own bylaws." 323 S.C. at 72, 448 S.E.2d at 586. The court then found that the plaintiff did not establish the requisite standard of care. Thus, Tuomey's conclusion that *Strickland* does not impose the doctrine of corporate negligence on hospitals is an assumption which is not supported by the language of the case.

Given the cumulative public policies surrounding the operation of emergency rooms and the legal requirement that hospitals provide emergency services, we firmly believe that hospitals must be accountable in tort for the actions of care givers working in their emergency rooms. Accordingly, we agree with the New York court which wrote:

> In this Court's opinion it is public policy, and not traditional rules of the law of agency or the law of torts, which should underlie the decision to hold hospitals liable for malpractice which occurs in their emergency rooms. In this regard the observation of former UNITED STATES SUPREME COURT JUSTICE OLIVER WENDELL HOLMES is apt: "The true grounds of decision are consideration of policy and of social advantage, and it is vain to suppose that solutions can be attained merely by logic and the general propositions of law which nobody disputes. Propositions as to public policy rarely are unanimously accepted, and still more rarely, if ever, are capable of unanswerable proof."

*Martell v. St. Charles Hosp.*, 137 Misc.2d 980, 523 N.Y.S.2d 342, 352 (N.Y.Sup.Ct.1987). Thus, we hold that hospitals have a nondelegable duty to render competent service to the patients of their emergency rooms.

Therefore, we reverse the trial court's grant of summary judgment and remand the case for further proceedings.

**REVERSED AND REMANDED.**

CURETON and HOWARD, JJ., concur.